All right, we're going to hear the case of Waters v. Clarke and Mr. Dolan. Thank you, Your Honor. Good afternoon. May it please the Court. The Supreme Court of Virginia reached an unreasonable decision in this case on each of Mr. Waters' three Brady claims for three separate reasons. At issue with respect to each of the evidence proffered by Mr. Waters on each of his Brady claims was that this evidence casts significant doubt on credibility of each of the state's witnesses at Mr. Waters' trial. And credibility in this case was the only thing that the state had going for it. This case had no physical or photographic or other evidence. It was all about the credibility and recollection of the witnesses. And the three main witnesses in this case was the child, the child's mother, and Lieutenant Pleasance, who investigated the case. The evidence that was proffered by Mr. Waters indicates that it's quite likely, or at least it's reasonable, that the outcome of this case would have been different had the jury been exposed to this evidence. So, for example, with respect to the child's exposure to pornographic materials, the child in this case, when describing her attack, never described her attacker, was never able to identify him when he was sitting 20 feet away from her. She was asked, is he present here? And she says, I don't know. She was asked, what does he look like? She says, I don't know. She asks, does he have a beard or a mustache? She says, I don't know. So, the pornographic evidence, and the only way she describes him is not by his name, it's not by what he looks like, she describes him as TV man. The fact that the child was exposed to pornographic material makes it quite likely that what she would refer to as a TV man was actually a person on TV. In fact, there are scientific studies that we've cited in our brief that show that while children are not necessarily confabulating stories. What is the purpose of these arguments about what she did identify and didn't identify? We aren't reviewing that. We aren't the trial court. Correct, Judge Shedd. Tell me why that matters. I think it matters to the extent that the presence of these, the pornographic materials cast significant doubt on her credibility and had the jury been able to consider it, the jury was already viewing her credibility critically because after all, the child testified at trial that Mr. Waters penetrated her with his finger, and yet the jury acquitted him of the charge of penetration because the child's testimony at trial was inconsistent with what she told the nurse. If the jury was able to consider further evidence that the child's recollection may be suffering from exposure to pornographic materials or other events in her life, and I'll get to the additional TV repairman who visited her house, I think that would have cast further doubt on her credibility and would have very likely made— Is the basis for the denial of the petition that it wouldn't, that it would not go to the question of credibility? Or was it the question of what the prosecutor possessed at the time of the trial? I think, Judge Shedd, I think it's both. The Supreme Court version denied it both because they said it's not material, but also because the prosecution did not possess it. But let me address the issue on prosecution possession. The only evidence that the prosecutor did not possess it was a statement by Ms. Oglesby in her affidavit, an affidavit which was actually contradictory on other issues to the record. And so I'll get to that, if you permit me, in a moment. But there was an affidavit by Mr. Waters that he received a letter from Mr. Saub that actually stated Mr. Saub was a party that was not hired by— even though he represented Mr. Waters, was not hired by Mr. Waters, was hired by the company to kind of look after his interest in a civil trial, that stated that these facts were discussed with the prosecutor. There was an affidavit of Mr. Waters in his initial petition swearing to those facts, and in his petition for a re-hearing, the actual letter from Mr. Saub was explicitly referenced. And under Virginia Supreme Court Rule 1-4-I, just mere reference to an exhibit necessarily makes that exhibit part of the record. Virginia Supreme Court denied petition for a hearing without comment under Richter-Harrison analysis. This court should presume that it was denied on the merits as opposed to because, you know, on independent procedural state bar. So on one hand, we have a letter from an officer of the court who sat there during civil litigation with a judge who was a mediator of the case with attorneys from the other side saying, during our discussion and in our settlement agreement, we have statements from the parents of this child that this matter was discussed with the prosecutor. On the other hand, we have a self-servant affidavit by Ms. Oglesby that doesn't even deny that the child had access to pornographic material. It simply says, I did not have knowledge the child viewed pornographic material. But Mr. Waters did not allege just viewing. He alleged both viewing, exposure, and just mere access to these materials based on the fact that her parents were subscribing to adult channels in her home. The prosecutor actually doesn't deny that in the affidavit. So the fact that the Supreme Court of Virginia said— So wait a minute now. Wait a minute. So you think if you were to establish that somebody had access, which meant they could potentially view, you think that establishes they viewed? No, Your Honor. I think, again, there's two issues. In the motion in limine on that very same point, do you think you necessarily win that? If that motion in limine to exclude that testimony that she had access to at trial, do you think you would have to win that? I believe so because it goes directly to the child's credibility. Again, a child who could recollect nothing about this event, could not even recollect whether, you know— I can see you might do that if the evidence was she viewed it. She viewed it. I think you would have to win. The fact that she maybe had access to it, I'm not sure you'd necessarily win that. Well, Your Honor, there's certainly evidence that she viewed it. So the customer, the call log, as the state refers to it, the memorandum— Yeah, but the question is what the prosecutor knew. I thought that's what you were focusing on. No, correct. So I just want to make clear there's sort of two issues. The fact—did the child actually view it? And I think that evidence is incontrovertible that the child viewed it because the mother called Dish Network saying, please take this charge off my account. Yeah, but doesn't the government have to have that information, not the mama? Correct, Your Honor. Again, I'm just trying to point out that there's kind of two issues. Did it actually happen and did the government know about it? The fact that it actually happened, I think, is undisputable because otherwise why would a parent call the Dish Network and said, please take this charge off of my account because my daughter ordered it, other than that the parent actually viewed it, saw the child do it. The second issue, you're quite correct, is that the government has to know about the fact that that happened. And I think that comes in under the solid letter that was initially referenced in the first petition for Habeas and Virginia Supreme Court and then explicitly cited in petition for a hearing. But going to the unreasonability of— It's not the petition for a rehearing. What was the evidence? The SOLB letter, the letter from Mr. SOLB, who was Mr. Waters' attorney in a civil case, although hired not by Mr. Waters but by Rocking Iron Dish. And the letter says, and it's in JA-113, it says, it might interest you to know, to Mr. Waters, that during our settlement negotiations and in our settlement agreement, following evidence came out that— evidence of intimate nature was discussed with the prosecutor during a criminal trial. And that intimate nature was footnoted and the footnote said, when I say intimate nature, I mean whether the child was exposed, reviewed, or had access to pornographic materials. And so that letter was explicitly referenced in the petition for a hearing. And we know that—and my submission is that Supreme Court of Virginia was unreasonable in its entire view of the evidence because if you turn your attention to how they described this customer service law, even on the issue of whether a child ever actually viewed pornographic material, they actually—they denied on both counts. They said the prosecution had no access to it and they said Mr. Waters proffered no evidence that the child ever viewed pornographic material at JA-13536. And the reason they say that is they said because the customer service law does not identify the child's family. We can't figure out who it belongs to. But that is clearly incorrect because that very page identifies the child's mother by first name, the next page identifies by last name, by address, by the—identified by the fact that Mr. Waters was the service technician, and by the fact that Lieutenant Pleasance was the one investigating the case. Given that, it is hard to imagine how a reasonable court could view all of that, all of that evidence that was properly submitted, and then say that this piece of evidence does not clearly identify the child's family. And I think that sort of unreasonability pervades the entire Supreme Court analysis. So turning, for example, to the issue of sting as the court describes it. There's evidence in the record, again, properly submitted in the initial petition for habeas, where Mr. Waters' employer explicitly states that I cooperated with police, we set up a sting. The words he used, this is not the words Mr. Waters invented or even the one that came from Virginia Supreme Court. That we set up a sting with the police to get him in. Now, just to be clear, we're not arguing that there's anything wrong with doing that. Is there any evidence in the record that there actually was a sting set up by the police to get him in? Yes, Your Honor, that was the statement of... Right, that's what the employer says. But is there evidence that that actually happened, that there was cooperation with law enforcement, other than the employer just... Other than the employers, no, but I would point out that the state actually doesn't deny it. In Ms. Oglesby's affidavit, all she says is that I was not aware of this. She actually doesn't say it didn't happen. There's no affidavit by Lieutenant Pleasance. Well, I gather your argument is that because whatever was set up there, he was sent to Virginia by the employer and didn't go there of his own free will, which was the point made at trial, that he didn't go to Florida but went to Virginia. Correct, correct. And so my point is that the Virginia police, or Gushland County Sheriff's Office, manufactured a situation causing Mr. Waters to be in Petersburg. Again, I'm not suggesting there's anything wrong to do that. That's how police works. But they manufactured a situation and then used that very manufactured situation to initially imply a trial during Lieutenant Pleasance's testimony and then explicitly make it explicit in Ms. Oglesby's closing statement that Mr. Waters is a liar. And that's the problem. It's not the actual sting. It's the fact that they've manufactured the situation and then to get Mr. Waters in and then use that situation. And what's the evidence that the government had that before the trial? Well, the evidence is that Mr. Riddell's boss's testimony. And nothing on the other side. Again, Ms. Oglesby does not say in her affidavit that it didn't happen. She says I was unaware of it. That's the mode that she can testify to. Well, who does know about it on the government side? Lieutenant Pleasance, the investigating officer. And in the testimony by Mr. Riddell, Mr. Waters' boss. Did anybody interview him recently and since that time? Not since the civil time, but in part because Virginia Supreme Court denied ability to conduct any sort of evidentiary hearing. So Mr. Waters had to go only on paper. But that testimony is backed up by his own interrogatories as well as by the testimony of his company's attorney that also testified in civil trial. And again, the state offers no evidence to contradict this. The state simply says the prosecutor was not aware. But first of all, it doesn't really matter whether the prosecutor was aware because knowledge of whatever the police officer knew is imputed to the state. Did the defendant take the stand? The defendant did not take the stand, Your Honor. The defendant did not take the stand. But the point is, the reason this evidence is important is because it, number one, casts doubt on Lieutenant Pleasance's testimony. And number two, it actually verifies or corroborates defendant's story. And as the Second Circuit held in Triumph Capital and 11th in El Zad and 1st in Uditrecu, evidence that supports defendant's version of events is Brady material. And this also relates to the prosecutor's closing statement when she called him a liar. This court has held in other cases. The affidavit says more than just that she wasn't aware of it. It says the Sheriff's Department did not instruct Rocking R to have the defendant come to any location as part of a sting. And that's fine, Your Honor. But again, that's not what Mr. Waters alleged. And I think the fact that Sheriff's Department did not instruct Rocking R is very different from saying we did not cooperate to work together. It's one thing to order someone to do it. It's quite another to say we worked together. I think instruct has this connotation that it was the Sheriff's idea. But it doesn't have to be the Sheriff's idea. It could have very well been the idea of Mr. Waters' employer, Mr. Riddell. But if the police said, yes, that's what we should do, and the police knew about it, I think that is brainy material because it both casts doubt on Lieutenant Pleasant's testimony as well as corroborates the defendant's story, and makes Ms. Oglesby's calling Mr. Waters a liar in a closing argument so much more pungent and so much more inappropriate. It is generally inappropriate for the prosecutor, as this court has held on numerous occasions, it's generally appropriate for the prosecutor to call, to opine on the veracity of the defendant. Now, not in all of those cases. That's what I'm questioning. The prosecutor called your client a liar. Was there any evidence of your client's position? I mean, a statement that he mistold the truth? I don't believe so. I mean, if you look at a statement in context.  So what happened was, Lieutenant Pleasant, when she was alerted to this allegation by the mother, by Nathalie, she started calling. She called Dish Network and then Rocking R. And then Rocking R called Mr. Waters and said, police is looking for you. We don't know why, but they're looking for you. And Mr. Waters, of his own volition, he called the lieutenant. He said, yes, I was at this house. Yes, you know, here's my cell phone number. I'm happy to talk to you, but for the next two weeks, I'm on my way to South Carolina. If you want to reach me, here's my cell phone number, and I'll be back in two weeks. So that's where that statement came from. So he reported that during the course of trial? No, he reported that during the course of investigation. Lieutenant Pleasant, you've got to understand, that was actually the only reason for her to testify, because nobody denied that Mr. Waters was in the house of the minor. Nobody denied that he was. I don't know, but I'm trying to get. He said he was going to South Carolina. Where did that come into evidence? Lieutenant Pleasant testified. He testified? Yeah, I talked to him on the phone. He said he was in South Carolina, but guess what? He was captured in Virginia, and that statement was used by Ms. Oglesby at closing. I know who that was. Okay, I just want to know where the liar is. Yeah, that's how it came in, because he didn't take the stand. So Lieutenant Pleasant testified that he said he'll be on his way, but it turns out he was in Virginia. So in my remaining time, Your Honor, if you would permit me to get to the third Brady issue about the email. Now, there's certainly no question that the email was in possession of the prosecutor, because it was sent to the prosecutor and was replied to. And the email indicates that for the very first time that the child was asked and said, and so indicated the time frame, and that the mother could put pieces together as to who may have been this undescribed TV man. Because remember, at no point was this TV man described. It was six months after the attack, after multiple interviews by the child, by the police, and the prosecutor, by multiple discussions between the mother and the child and the father and the child. The first time that the child says, my baby brother was sleeping in the crib, and the first time that the mother says, oh, well, you know, the other TV repairman was African-American. The problem, and again, so this goes back to the lack of sufficiency in Ms. Oglesby's affidavit. She says, the child always identified the defendant as white, the attacker as white. Now, Your Honor, I've read... How is that exculpatory? How is that email exculpatory? It's actually... No, well, it's exculpatory in two ways. First, I've diligently read the trial record. At no point does the word white appear except with respect to the T-shirt that the TV man was supposedly wearing. There's no other instance of the word white, if you permit me to finish, Your Honor, as I... The second way it's exculpatory is that it indicates that the child was never so properly questioned. By the time she indicated the time frame of when this attack supposedly happened, it was after multiple interviews with police officers. And again, as the studies we've cited in our brief show, that children tend to... Again, not because of any malice, but children tend to internalize previous questions, previous discussions, and then they cannot monitor the source of their memories. And that is the problem. That's why it's so difficult to properly interview children and properly to get their decision. That's why that email is exculpatory. All right. Thank you, Mr. Dolligan. Please, the Court. The Director would ask that the decision of the District Court be affirmed. The sum of the brief here is an attempt to relitigate the findings that the Supreme Court of Virginia made in dismissing these claims in state habeas. We are, of course, not relitigating them. We're here to review whether the State Court made findings that were not unreasonable. Let me ask you. The 4-year-old's testimony in this case was really quite narrow. Yes, sir. Testified to only about two or three facts and didn't know anything else. There's a credibility issue between her and the defendant. Well, her credibility is the issue. The defendant never made a statement admitting or denying the crimes and never took the stand. Well, except the argument is the presumed innocence is put to question because he lied about going to South Carolina, and that was a big point argued at trial. Your Honor, I'll come back to the question, but I would dispute that that was a big point at trial. Well, she made a point of a trial that he was in the heat. He felt the heat and fled to South Carolina to avoid prosecution, basically. That was the argument. That he left the state, yes. And the truth of the matter, he was sent to Virginia where he was arrested, right? I thought the court was suggesting that the issue that he had lied about his destination was a big issue at trial. That only came out in rebuttal. Not a big issue, but the fact is it's this 4-year-old against him, basically. That's the evidence. There's no corroborating evidence of any kind, and the evidence that the 4-year-old put in had some problems even as to whether there was penetration or not. So, why I'm positing this as part of my question is that this is a very bare-bones prosecution in terms of evidence. That's all there is. Yes. And yet we have the possibility, and we'll go to the mechanics of this, we have the possibility that she had seen an adult picture or parts of it, and the possibility that the defendant was not lying. There's no evidence that he lied, and yet that was argued to the jury. So, in that context, both of those seem like they could be important. Don't you think? I don't agree. Don't you think you would want to try to put in both those things?  No, I said if they were presented. Not in the trial record. They're not in the record that comes to this court. There is not evidence that the child ever saw pornography. There is evidence. No, no, no, no. I said if the child saw pornography, and if this man was directed to Virginia and arrested there, and that evidence was known by the defendant, number one, the prosecutor could not say he was a liar, and number two, the argument could be made that the child was transferring pornographic images in a circumstance where whatever, she wanted detention or whatever. That's an argument that could have been made that was denied. Now, the question is, was it available? Did the prosecutor have it and should have been turned over as a Brady material? I just am addressing whether it's Brady material, and I think it probably is based on that, unless you say it shouldn't be. It seems to me that any defendant's lawyer would love to have both those pieces of evidence in view of how the case went. Your Honor, please. The allegation that there was evidence that the child viewed pornography was rejected both by the District Court and the Supreme Court of Virginia. Both found that there was no evidence that the child ever saw any pornography. In fact, in the opening brief, the most that Mr. Waters alleges is that there's a possibility. Wasn't the evidence that the mother called in and canceled the child? The evidence was that the mother called in about a concern of the charge. The narrative goes on in the call log that they could never find the charge. And even in the additional exhibits that he submitted unauthorized to the state, there's no entry for a charge or deletion of a charge. There is a charge. I saw it. There's a charge for the Channel 10 every month. No, no, there's a charge also for the film, right? There's a charge for a film. I don't remember the name of it. There was a charge for a non-pornographic film. But I don't believe there's a charge of pornographic. And the call log shows that he couldn't find a charge for pornographic. What did the mother say to the, what was it, DirecTV? What did she say? Where is that? It's in the call. I'm going to paraphrase if I try to repeat it, and I don't want to do that. What page is it on? According to the call log, and again, the call log was hearsay. Just tell me what it says. There's an entry in the call log. States her daughter order adult PPV. By mistake, want PPV removed. The top of 453, purchase history no showing of adult PPV. So apparently from the call log, someone, Mr. Waters argued and he can identify this victim's mother, called concerned that there had been a PPV movie ordered. The response is there wasn't. If the attorney defending the defendant had that evidence, that the mother called and said the child had ordered an adult film, would that have been useful exculpatory for the defendant's use? The most use he could have made of that, Your Honor, is that he could have cross-examined the mother about whether she made that call. Her specific testimony at trial was the child never viewed anything but children material. You don't have to explain that telephone conversation, wouldn't you? She would, but it doesn't contradict the testimony she made at trial that the child never viewed adult material. She had to have some basis for making that call, didn't she? Again, Your Honor, the call logs here say we don't know that it's true that she did that. I understand we're talking about a hypothesis. If defense counsel had that information, he could have, number one, investigated further and, number two, he could have cross-examined the mother. He could have. And don't you think that would have been helpful? I don't think it would have been material. The mother was already specific in her testimony that the child had never viewed it. Well, that would be wrong, because there is a log call, a specific log call that you wouldn't doubt, where she reports her child had ordered pornographic material. And even taking that at face value, Your Honor, reports. I hypothesize that maybe the child, instead of ordering it, was watching the TEN channel, the T-E-N network, and she caught her, and the mother just mischaracterized it in calling. But she made that call for some reason, worried about her child having ordered pornographic material. The question is, shouldn't she have been examined about that, cross-examined about that? I think in a case where you have a four-year-old who says, basically, he touched me, and almost nothing else, that might be a legitimate question. Two points, Your Honor. Even taking the call log at its face value, it says, this mother calling in says the child ordered, not that the child reviewed. And, in fact, when the representative was trying to verify whether they were viewed or not, they couldn't answer that question. So when you order it on the television, doesn't it just come up then? Isn't it plain? It can. It can be saved. At least my service, it can be saved for later. You can change back to the other channel. Someone else can change to the other channel. Well, you're not charged for it. It can be saved for later, is it? Comcast does. I don't know how DISH does. But the critical point that the… as an employment duty, wouldn't that have helped a defense counsel in defending this man and not permitting the prosecutor to argue he was a liar? Can I stay with the call log issue for the second point I wanted to make as well, Your Honor, or I'll come back to it? Go ahead. Either way. The second point, and the reason the state court denied that as a Brady claim, was there was no evidence that it was known to the prosecution. Well, I understand that. We're going to get to that. I just want to know whether it's Brady material. And it sounds to me like it might be. That's what I'm exploring with you. And I think in a case where the trial of this, and it's a very, very serious charge, the trial of this is dependent entirely on a few sentences of a 4-year-old, it's worth looking at the circumstantial evidence around and the Giglio-type stuff and cross-examination and all that. The question is, wouldn't defense counsel want to have had that material? Now, we get to the next questions, which you raise, is whether it was available to the state and known to the state before trial. And I think, if I understand Your Honor's question, it really only goes to whether it would be helpful to have, not whether it would have been material. If the prosecutor knew the full blow of those two things that we have now, would the prosecutor had a duty to turn it over? And I'm sorry, I've gotten lost in our questions. The two things, the call log and the… Look, I'm not trying to be cute about this. If the prosecutor had that call log in her file, and if she had the statement that the employer sent him to Virginia, where he got arrested, if she knew both of those things, would she turn those facts over as part of the Brady material? Well, she would have turned the call log over. I'm not sure the fact that the sheriff knew where he was arrested would on its face have been exculpatory. Yeah, except the officer was testifying differently. No, the officer never testified whether or not she was involved in the arrest. She testified to a narrative. She didn't testify only to the fact that he told her he was going to South Carolina. She testified to the history of her becoming involved in the investigation, what she did next, and leading up to her conversation with Mr. Waters, and reported that Mr. Waters volunteered to be in South Carolina. The lieutenant never testified that she had lied. Would it be abuse if she had that information? In other words, if she knew that the defendant was being sent to Virginia to pick something up or to do something there before going to South Carolina, would it have been improper for the prosecutor to argue that he was a liar? I don't mean to take undue time, Your Honor, but the prosecutor's comment that he was a liar came only in response to the door having been opened by defense counsel in its closing, postulating that the reason Lieutenant Pleasance had testified was to imply he was a liar. And he had made a statement to Lieutenant Pleasance that was factually not true. He had not been on his way to South Carolina. Why is that so? If you know all the facts, maybe he had to go pick up this package at the direction of an employer and then he was going to South Carolina. The point is, if that information was in the file of the prosecutor, the prosecutor would have probably not said he was a liar. If the prosecutor had reason to believe that he was truthfully headed to South Carolina, no. They would not have argued he was a liar. The other evidence is actually that he was in Maryland. Why do you say the state didn't have possession of that information, both of them? Let me stop you before you answer that. You said that if the government had the TV call log, that that would have been turned over as braiding material. Would have been turned over. I think the question was whether they would have turned it over. I don't think it was whether they would characterize it as braiding material. The question was as braiding material. Would it have been turned over? Is your answer, would it have been turned over as braiding material? Or otherwise, why do you mean it would have been turned over? I think it would have been turned over out of caution on the potential that it was braiding material. I don't know that the prosecutor would necessarily. Your answer is you think it would have been turned over, but that turning over doesn't necessarily concede that it's braiding material. Yes, Judge. Okay. Now, he was asking, I think, if you knew all that information. Yeah, I was wondering if both these items were known to the state, maybe not this particular prosecutor. Imputed to the state before trial. What's your answer? Whether they were known to the prosecutor before trial? The call log clearly was not. I take that she's chargeable with knowledge of other government agents. But with that understanding, whether she knew it or not, that there's no evidence that she knew it and there's positive evidence she didn't. I'm not talking about whether she knew it. I said did the state, anybody on behalf of the state know it? And there is no evidence showing that they did. She's denied that she or anyone else connected with the case had it. Did the investigator know? There's no evidence the investigator knew. About the sting? I was referring to the call log. Well, the call log, there's evidence that the prosecutor directly knew about it because the attorney told her. No, Your Honor, I think that's over-reading Mr. Saab's letter. It may be, it may be, but it may not be. Well, no, it clearly is. Mr. Saab says at most that a comment was apparently made, so he was not privy to, that at least some of the more intimate subject matters, which may or may not have included whether she saw pornography, were believed to have been discussed with prosecutors. So it's at least one level of hearsay and speculative at that. There's no affirmative evidence from Mr. Saab's letter, that's in the Joint Appendix 113, that shows that the prosecutor knew. And Mr. Saab's letter was considered by the district court.  to indicate that the prosecutor may have known about some. Well, I'm not sure what Mr. Saab was writing. Other than that paragraph, the rest of the letter is redacted. But there isn't any evidence, Your Honor. I dispute that Mr. Saab's letter establishes that there isn't any evidence, and both the district court and the state court found. The district court, in fact, went beyond finding. The state court's finding was not unreasonable and agreed. It found the Supreme Court did not make incorrect findings about the prosecutor's knowledge with respect to the call logs. Let's walk through this again now on the liar comment and any information that the government was aware of. You know, people call it a sting or involvement or whatever that word is. I don't want to hang up on that word. But there's some suggestion that the police helped lure him with the assistance of his employer to Virginia or where they could get him. But he said earlier something that explained that to me and how the lie comment arose. Yes, Your Honor. He had spoken to Lieutenant Pleasance on, I believe it was a Friday. And said, if you need me, I'm going to South Carolina. He was on his way to South Carolina. Okay, I got that. The next day, which I believe, if I'm probably right about the Friday, it was a Saturday, he was arrested in Petersburg, Virginia. Obviously he had not been in South Carolina that day. Yeah, but he could have been going. But he could have been going to South Carolina, right? But that was the extent of Lieutenant Pleasance's testimony. Okay. Told me he was going to South Carolina Friday, arrested in Petersburg on Saturday. That's all she said. He was going to go to South Carolina, he told me. But guess what? He was in Virginia the next day. And I think she didn't even characterize it as a gas rut. She gave a very fact-based narrative. No, no, no. I mean, that's the purpose of it, though. But the point of that— Well, the purpose of her testimony, Your Honor, was to give a narrative to the timeline of the investigation. So you don't want to stress on that point and make that point about where he said he would be and where he was. She was just giving a narrative. Yeah. Okay. And in the Commonwealth's closing argument, didn't refer to that. Right. It was in the defense's closing argument where he tried to minimize Lieutenant Pleasance's testimony by arguing the only reason she testified was, I guess, to suggest he was a liar. In rebuttal to that argument was the first time the Commonwealth argued that he was a liar because he had said he was on his way to South Carolina, and it turned out he wasn't. And also referring to the fact he couldn't stand the heat. But that was true even if he had gone to South Carolina. The fact that he was leaving Virginia and the characterization that he was fleeing the heat had nothing to do with— Where is that in the record? Do you know where that closing argument is? Yes, Your Honor. Sorry, Your Honor. Sorry, Your Honor. I'm at the wrong page of my tabs. The defense's closing argument is at Joint Appendix 727, which I believe is the second volume. Was there an objection at trial when she said in reply or rebuttal that he is a liar? Was there an objection? There was not. Okay. The habeas claim about that was simply that he couldn't be called a liar because he hadn't put his credibility at issue. He hadn't testified. But your state said, we were just commenting on the fact that they commented on our evidence by characterizing as he's a liar. And in rebuttal, the Commonwealth said that— He's a liar based on what? He did said South Carolina, but he was arrested in the Saturday in Petersburg, so he's a liar. But the Commonwealth goes on in the very next sentence after he's a liar to say, and there could be many reasons why he said it. A lot of people do things under pressure, but the facts are undisputed. He said he was going to South Carolina for two weeks, not for a day, and was arrested the next day in Petersburg, and then says, mistake, lie, truth, and leaves to the jury to infer which this is. Let me ask you this. Why does that make him a liar if he says he's going to South Carolina, he's just not going the next day? I'm just asking that. Can you have a flat tire? Why does that make you a liar? I'm just asking. Or do you think it presents evidence from which you can call him a liar? Why does that make somebody a liar? If I tell you I'm going to South Carolina and I don't go tomorrow, I could go Friday. Would that make me a liar? Well, what his statement was not that he was going to South Carolina someday. He said he was going to be unreachable after he spoke to Lieutenant Pleasance, but he's going to South Carolina for two weeks. His being in Petersburg the next day is inconsistent with that statement. This is what she said. She says the defendant says I'm on my way to South Carolina, be there for two weeks. And he says, well, I gave her a cell phone number. I can say is it he was feeling the heat. He didn't want the police to pursue him at that point. For whatever reason, he said South Carolina, but he lied about it because we know he was arrested on Saturday in Petersburg. So he's a liar. And there could be many reasons why he said it. A lot of people do things under pressure, but the facts are undisputed. It's a pretty strong statement. If he had been lured to Petersburg with the police and the employer to do some employer's work. Of course, his statement to Lieutenant Pleasance at 655 was he told me he was on his way as we spoke to South Carolina. That apparently was not true. How do you know? How do you know that wasn't true? The evidence that the police were involved, Your Honor, and the district court did a better job than I'm going to in the short time remaining, but it's not clear from Mr. Ruttles' deposition in the insurance suit that they worked with the police. No, I'm asking, how do you know he wasn't on the way to South Carolina? They arrested him in Petersburg, but he could have been on his way to South Carolina, despite the fact we know now that he was going to do a job there. And apparently he came to that job from Maryland. No, but you say, is your position that he said as we spoke, how much after the telephone conversation was he arrested? The next day, right? The next day. So I see. You say that by his saying, I'm on my way to South Carolina, as I'm talking to you, that when he shows up in Virginia the next day, that creates a reasonable inference that he wasn't telling the truth about being on his way to South Carolina. He might. Maybe he wasn't lying, but at least that's a reasonable inference for you to say he was lying. Yes, Your Honor. And you say you didn't first raise it. It was raised, actually, by his defense lawyer. Yes, Your Honor. By whether he's telling the truth or not. And Ruttles' deposition is unclear on the sequence of his involvement with the police. At one point he says he talked to the lieutenant after it was all over. He couldn't recall whether he called the lieutenant before or after he got information about what Mr. Waters was suspected of. And his entire conversation with the lieutenant is suspect because he repeatedly returned to Lieutenant Pleasance as a man, as a guy, as he, as him. Lieutenant Pleasance is a woman. There's nothing in the deposition that's submitted by Mr. Waters that the lieutenant or anyone else in the Sheriff's Department asked Ruttles to get Mr. Waters. How did they know where he was in Petersburg? I thought he was told by the employer. How did they arrest him? The employer advised the police, but there's nothing in there that the police, sheriff, excuse me, asked the employer to get him there. It doesn't matter. If they knew he was going to be in Petersburg for a job, then he's not lying when he's saying I'm on my way to South Carolina. In other words, my whole point is, this case, it's hard to figure out what would tip the balance or not because the prosecution's evidence is very thin. And it seems to me that if the prosecutor clearly had these facts in her file, the trial might have been a little different. And the question is, would it have made a difference? Your Honor, I see I've gone quite over my time. You can comment on that if you want. You don't have to. I was just making an observation. Let me ask one question. Do you make the argument that although you've asked him some pretty direct questions about what he's saying while we argue the evidence at this level, who should be believed and who shouldn't be believed, is it that we could take some question with perhaps, but the standard of review is whether or not what the court did was unreasonable? Yes, Your Honor. It seems to me, this seems to me, quite frankly, to be a fairly thin case as cases go. But it's not a case on direct appeal from a district court. It's a question of looking at what the Supreme Court did in Virginia or other courts did. What do we make of what they did in light of the law? You understand my question? I do. And if the court will indulge me for a few seconds, I'd like to address that in a specific context. With respect to this, the circumstances of his coming to Virginia or staying in Virginia and being arrested, the district court specifically found that there were, the evidence did admit of two possible interpretations, that the police, sheriff, commonwealth had no knowledge prior to it or that they were involved, and that either interpretation was reasonable. If that's the case, then the state court having adopted one or another of two possible reasonable interpretations, the evidence cannot be unreasonable. Your Honor, I should say I've gone well over my time. I'd be happy to answer any questions of the court, but I don't want to impose more on his time. Thank you. Mr. Dolan, you have some. Thank you, Your Honor. Just a few points. You can get to those in one second. With respect to the evidence of the alleged pornographic observations by the child, didn't the prosecutor put in an affidavit saying she did not know of that evidence beforehand? She did, although that affidavit, like I said, is limited. It said, I'm not aware of a child viewing pornography. It doesn't talk about a child being potentially having pornography available simply by clicking through the remote without any category. Available is not enough. I'd have to go further than that. Perhaps, Your Honor, but also that affidavit is directly contradicted by the assault, and that affidavit, Your Honor, is being viewed as a whole is simply not credible. Again, the prosecutor also in the same document finds that she is, that the child identified the attacker as white. That is simply not correct. There's nothing in the record to support that. So the affidavit is simply not credible on its face, I would submit, or to the very least. There is, you know, on one hand, you have a conclusive affidavit, a self-serving affidavit from Ms. Oglesby. On the other hand, you have a letter from a disinterested third party, a party that was not involved in criminal litigation, that was not hired by Mr. Waters, who states this was disclosed to me during civil negotiations and in front of a judge. Is that an issue that the state could make a finding of fact on? I don't think on this record, without further investigation, I think a finding of fact simply crediting the prosecutor's affidavit wholesale. And that's, Your Honor, if you compare the Supreme Court's opinion to the affidavit, they're almost verbatim. Prosecutor says the victim identified the child as white. Supreme Court says that. You know, victim was never exposed to, was never viewed pornography. Supreme Court says that. And as, Judge, as you pointed out, the only reason, the only basis for the mother to make that phone call to Dish Network in the first place was because she observed her child viewing pornography. It's not as if she woke up one day and said, I'm going to talk to Dish Network. I think if she had direct evidence or had that call record in her file, I think she would have turned it over. And that isn't the issue for me, really. The issue for me is, further along, is number one, whether she reasonably had knowledge of this to require it to be turned over. And then second, whether the Supreme Court or whether the state made an unreasonable finding with respect to that. Understood, Your Honor. And I think I would submit that given the dearth of, even the prosecutor's affidavit post-trial, given the fact that it's directly contradicted by the evidence in the record and the Saul Blatter, I think at the very least, Mr. Waters should have gotten an evidentiary hearing to actually perhaps depose the parents of the child to see did they say this to the prosecutor or did they not say it to the prosecutor. Simply credit the prosecutor's bare bones affidavit, I think is an unreasonable application of federal law. And if you permit me in the last couple seconds that I have. But if in fact, let me ask you this, if in fact that specific line from the affidavit, which is a proper affidavit, is not specifically directly contradicted by the letter, then why is there any problem with crediting that line from the affidavit? Is there any legal impediment to somebody doing that? Well, Your Honor, I think on the, you know, I don't want to fight the hypothetical, but on the hypothetical, I think you are correct. I would submit that the letter does directly contradict it. I would submit the letter. But I think, again, if you permit me, Judge Niemeyer, you hit the nail on the head in your colloquy with a state, that the issue here and what's unreasonable about the Supreme Court of Virginia's opinion here, the question that this Court and the Supreme Court should have asked, whether all this evidence taken together, the evidence of the state, the pornography, the email, could have reasonably put the verdict in a different light, could have reasonably undermined. In other words, we are talking about a violation of Brady is the handle by which you do it. Now, we take cases and try them in a slice of time. If the prosecutor didn't know about any of this, they tried it right in the time and with the evidence available at that point. We can't go back and keep trying cases 20, 30 years in the future. I completely agree with that, and I take your point. I would submit that on the evidence, at the very least, should have gotten Mr. Waters to an evidentiary hearing to see what the prosecutor did or did not know. But I think also the fact that the Supreme Court of Virginia went item by item and said, not material, not material, not material, never doing the cumulative analysis, never sort of simply, again, simply taking prosecutor's affidavit wholesale and just disbelieving anything Mr. Waters submitted, an affidavit, again, that was fairly bare bones. What relief do you want? We would certainly like an outright habeas grant. Barring that, we would take remand to district court for an evidentiary hearing. Unless there are any further questions, we'll rest on our breaks. Thank you. Thank you so much. We'll adjourn court for today and then come down and greet counsel. This honorable court stands adjourned until tomorrow morning at 830. God save the United States and this honorable court.
judges: Paul V. Niemeyer, Dennis W. Shedd, Stephanie D. Thacker